Case number 13-3107. United States of America v. Javier Eduardo Juan Ballestas, also known as El Mano Appellant. Ms. Park for the Appellant, Mr. Meisler for the Appellee. Your Honors, may it please the Court, Marie Park for Mr. Javier Ballestas. I'd like to reserve four minutes for rebuttal. When Congress extends the United States territorial jurisdiction in a criminal statute to include crimes committed on international waters, that does not mean that a court should then interpret this statute to apply abroad without any restraint. The Maritime Drug Law Enforcement Act is clear in its plain meaning. Section 70503B limits the extension of jurisdiction to the geographic location of international waters. If this Court believes that this limitation is ambiguous, the presumption against extraterritorial jurisdiction applies. In Kiobel, the Supreme Court considered different extraterritorial zones. Imagine, if you will, three co-centric circles. The inner smaller circle represents the United States. The second outer circle represents the high seas. And the third outer circle, foreign territory. In Kiobel, the petitioners made a similar argument the Department is making here. That, quote, because Congress surely intended the Alien Tort Statute to provide jurisdiction for actions against pirates on the high seas, it necessarily anticipated the statute would apply to conduct occurring abroad. What we now know from Kiobel is that it takes a big jump to make it to that outer third circle. In Kiobel, the Supreme Court reiterated the holding in Morrison. That, quote, when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms. So this statute, it clearly applies extraterritorially with respect to the underlying substantive offense. Yes. It's a limited extension, though, just to the high seas, international waters, and in some circumstances to the territorial waters of foreign countries. So it seems like the question then is if the underlying substantive offense applies extraterritorially in some dimension, then does the conspiracy and attempt parts of the statute, do they piggyback on to that extension as well? Yes. In our briefing, we addressed two different ways that the statute could be, the extraterritorial jurisdiction could be applied. We're focusing now on this oral argument to the geographic limitation, which was raised in our brief. In other words, the government raised in page 18 of their brief, they noted for a different argument, that the extraterritorial reach of an ancillary offense like aiding and abetting and conspiracy is coterminous with that of the underlying statute. So under section A, it's clear that the extension is limited to the high seas and on certain occasions the territorial waters of sovereign countries. So you agree that it applies extraterritorially. What you're saying is to be a conspirator, the conspiracy actually has to occur. Is it on the high seas or on board a vessel? Yes. And that's how the government has been using that statute. This statute has existed since 1980, the precursor statute, marijuana on the high seas. For over 30 years, the department has been using this conspiracy statute to charge crew members and captains in situations where the drugs were thrown overboard or the drugs are hidden in a vessel and it's difficult to prove knowledge or intent. And would you say the same thing about attempt? I'm sorry, to attempt? Yeah, because attempt and conspiracy are treated in the same provision. Yes, but it may be limited, again, to the extent of the extension, which is here, clear. It's only to the high seas and in limited circumstances to territorial waters. So, for example, so an attempt, if there's a vessel that's endeavoring to make it out to the high seas, it's at 11 1⁄2 miles, and it's interdicted just before it gets to the 12-mile international waters threshold, you would say the statute doesn't reach that attempt. For the crew member on board the vessel? Right. Yes, for the crew member on board the vessel. But there's two different potential limitations. One is on board the vessel. Yes. And one is reaching the high seas, right, because you could be on board the vessel and not yet gotten to the high seas. Yes. And which one of those are you relying on? Well, our position is if you just take the language in its plain reading, that it applies to the high seas and the territorial waters of foreign countries. But as I'm not sure if you're suggesting, but under Beleza Cartado, it's questionable whether the territorial waters area still applies. But let's say, just for the sake of argument, the high seas and on certain occasions territorial waters, foreign countries. The conspiracy statute here, you know, the government makes this big argument about the deterrence effect, how it's necessary to prosecute these leaders of DTOs who are pushing these vessels off the sea. But I just want to make the point that Congress has provided the government with more than one tool in its toolbox to prosecute this, to fight the war on drugs. Section 21 U.S.C. 959 has been used by the Department regularly to prosecute leaders of the DTOs who are hiring the crew and distributing drugs with the intent to import it to the United States. So in other words, we believe this prosecution is not only inconsistent with the intent behind the Maritime Drug Law Enforcement Act, but they also aren't circumventing the intent of Congress in 21.959 because that provision, Congress has made it clear that they seek prosecutions for conduct abroad only when there's a showing that the defendant knew or intended to import the drugs to the United States. Can I just make sure that I understand your position? The government argues that the language in 70503B applies to conspiracy explicitly and therefore no analysis under the charming Betsy canon of construction is necessary. You're not conceding that point, right? No. And your argument is that the conspiracy statute, well, conspiracy is a separate offense and it appears at 06. In the penalty provision, yes. But that the, I guess what I'm trying to understand is, are you saying that you think that this language in 03B can be read into 06 or not? We're presuming they're a strongest argument, and our argument is that the conspiracy provision, that its expiratory reach is coextensive, as this court said in OLLI, with the underlying statute. So in other words, the conspirators who are on board the vessels, they can be charged under the statute. Okay. So to the extent that the government is arguing that 06 conspiracy extends to co-conspirators who are entirely on land outside of the high seas and outside the jurisdiction of the United States, do you believe that the charming Betsy analysis is required to determine whether the statute reaches that point? Yes, and also the presumption against extraterritoriality, because the presumption, the question is, does this statute apply extraterritorially? The question when you're looking at the statute is, does this statute apply to conduct on foreign soil? And when you ask that question, we believe the statute is clear in its meaning that Congress did not have that intent. But if you disagree, if this court disagrees, then the presumption against extraterritoriality still applies. The presumption always stays with the statute. Just because it's rebutted for one question, doesn't mean you don't apply the presumption for the other question. The government says that based on kind of the protective jurisdiction in international law, that we should read it to extend to that. What's your response? Well, if you look at their argument on page 25, they are basically collapsing the charming Betsy doctrine into the presumption against extraterritoriality. They argue that because Congress intended to apply this statute, clearly they intended to apply it extraterritorially, there's no need to do the charming Betsy analysis. And that's what they urged the court in Carvajal and the court in our case. And the problem is the charming Betsy canon is its own independent separate canon of construction. And so just because Congress intends a statute to have some limited extraterritorial reach, that doesn't mean you don't go to the second question, whether Congress, did they intend to exceed international law norms. And under the, in regard to the protective principle, if you look at Judge Collier's decision, she noted at footnote 15, that the department was seeking a jurisdiction in excess of that provided by the 1988 convention, because the convention requires that the object of the conspiracy must be the commission of a crime in the United States. And she cited to Article 4 of the 1988 convention. Also, Judge Collier in her decision, she explained that the protective principle was an imperfect fit. But the problem was she didn't carry through the charming Betsy analysis. She stopped short. She said, well, it's clear this statute has extraterritorial effect so there's no need to do the charming Betsy analysis. And we believe that's not a correct analysis of these two separate canons of construction. You think that that's not correct under Ali? Yes. In the Ali case, this court did the charming Betsy analysis first and then looked at the presumption against extraterritoriality when you're looking at the aiding and abetting offense for piracy. Well, it did it first for the piracy, but what about with respect to the hostage? Yes. For the hostage-taking offense, this case is different than that because the hostage-taking statute, if you look at the language, there's no limitation on the extraterritorial application. It's clearly just a broad in the way the statute's drafted. Also, the hostage-taking statute was signed by Congress to implement the hostage-taking convention, which is based on the universal principle that hostage-taking can be prosecuted by any country. So it provided global notice to Mr. Ali that he could be brought to any court. But this statute's very different. Can I ask you, if the conspirators have to be on board the vessel, which I take it is what you're saying is your strongest position now, based on Ali, Yes. then what does the conspiracy, the allowance for conspiracy, add over and above the underlying substantive offense, given that you can get somebody for aiding and abetting? The way the department, this provision has existed over 30 years, and the department regularly charges crewmembers both with the underlying offense and with conspiracy. And why, do you have, we can ask them, of course, but what is the conspiracy adding if you're already on board the vessel? Where the drugs are hidden inside the vessel or the drugs are thrown overboard, the department has been using this conspiracy statute to help obtain prosecutions for these individuals at sea. I don't understand how is that different. What does that add? Oh, because under the conspiracy, the only evidence they have to provide is that there's an intention to do a criminal act. They don't have an intent to participate in the conspiracy. They don't have to show an intent to the actual possession of the drugs. So you're saying that if the drugs are overboard or if they're hidden, the government might not be able to prove possession or constructive possession? Yes. And if you think about it, this statute is over 30 years old. I'm still not following how you can get a conspiracy conviction with respect to somebody who was on board where you could not also get the underlying conviction. If they don't intend for there to be possession, then they can't get the conspiracy conviction either. You still have to intend the object of the conspiracy. Well, you know what's so interesting about this statute? It doesn't define what conspiracy is. We have to go by analogy to Section 371. Of the eight sections, conspiracy is only mentioned once. And it's in the penalty provision. It simply says that the jail term for someone who commits a conspiracy is the same as the jail term for someone who commits the underlying offense. That's all it says. But they still have to commit the conspiracy. A person attempting or conspiring to violate 70503 gets the same penalty as the person who does. Yes. And so I'm just following up on Judge Shinovasan's question, which is since they get the same penalty, what would the point of the conspiracy provision be with respect to somebody who is on board? Oh, I think just for basic criminal law, there's something that's worse than just committing the underlying fact. The act of a conspiracy, the fact that people are making an agreement to commit a crime, that's always just in U.S. criminal law, it's treated as a separate criminal offense. It is, but it's harder to prove than the other. So I'm still not following what's the purpose of the conspiracy provision if a person is on board. How does that make the government's case easier for somebody who's on board? That's the question. For somebody who's not on board? For somebody who is on board. Oh, who is on board. Well, if you look at, as we briefed in our briefing, there was one theory that the reason is that the people on the motherships, okay, so they would be, by making an agreement, they could be charged with a conspiracy. But I just want to be clear, the department has regularly been using this conspiracy statute. It doesn't really make any difference what the department's been doing. Sometimes the department does things legally. Sometimes they do it illegally. Sometimes they do it for no reason. Sometimes they do it for a good reason. Sometimes it's tactical. Sometimes it's stupid. That doesn't really resolve the question for us. The question is, what did Congress mean by the conspiracy section? Well, I think what Congress meant is the same reason they have the same conspiracy provision in Section 21 U.S.C. 959. It just adds another element of criminality. They charge both. Sometimes they get a conviction for one and not the other. They also get a double jail term usually. Sometimes the sentences are run consecutively. There's lots of reasons that Congress typically puts in a conspiracy provision with any criminal statute. But aren't there instances where the government might not be able to prove possession but could prove conspiracy? Yes, exactly. That was what I meant, Your Honor, when I was talking about the drugs being thrown overboard or the crew member who claims he has no idea where the drugs are hidden in the vessel. But if he had no idea, then he couldn't be convicted of a conspiracy either, could he? I'm sorry? If he has no idea that the drugs were on the boat, you can't convict the person of conspiracy. Well, he could have made an agreement to distribute drugs on board a vessel prior to getting on the boat. He could be a conspirator in that sense too. So he could do it? You can make a conspiracy off? Yes. Your position is that the entire crime could be committed off the boat? No, he could make an agreement to commit the conspiracy while on the boat. In terms of the act and further to the conspiracy, that would be on the boat when he was on the boat. You know, the extraterritorial net that is cast by the Department of Interpretation, I just want to explain how vast it is because they're using a single vessel to become a gateway to the United States to prosecute potentially all drug-related crimes in coastal waters. Now, it is a required search of the imagination. If you look at page 23 of the appendix, they include as one of the acts of this conspiracy a cargo truck that traveled from Medellin, Colombia to Turbo, Colombia. Now, suddenly, it was seized on February 2, 2009. Suddenly, we have the United States' jurisdiction over a truck and truck driver more easily than we have jurisdiction over a crew and the vessel because only the latter requires State Department certification. Only the latter requires consent from the foreign country. But the high-seas provision that you're talking about, that's not actually in the statute. That's the constitutional provision? Is that what you're reading this in? No, the geographic limitation as far as the extension, that's in the statute. Which section is that? If you look at Section 70503A, it refers to vessels, U.S. vessels, vessels subject to U.S. jurisdiction, and vessels with American, wherever they may be found. And the statute describes what's a vessel subject to U.S. jurisdiction. And they're all vessels that are on the high seas, international waters, or in certain circumstances, the territorial waters of a sovereign country. In other words, a vessel, it's our position, a vessel would never be on land. I just want to figure out where the high-seas requirement comes in with respect to a vessel without nationality. Well, a vessel without nationality, that does not come in for that. But it's a vessel. There's not a vessel on land, in other words. It's the high seas versus territorial seas that I'm asking. I assume that you're reading the words high seas out of Article I of the Constitution. International waters, which are also known as the high seas. So maybe I should just emphasize international waters or territorial waters. That's all that's referred to in the statute. But the vessel without nationality, where does that refer to? What kind of waters it's in? Well, the vessel without nationality, no. Yes, a vessel without nationality doesn't refer specifically to waters. But a vessel without nationality would be at sea with a captain claiming a certain country, say Honduras. So it sounds like a vessel without nationality, there's no high seas limitation. It can be in the territorial waters of a foreign state, and it still comes within the statute. Yes, I'm just talking about waters. When I describe that second concentric circle, that could be international waters, and in some circumstances, territorial waters. But just because there's an ex— If it's a stateless vessel. Yes. But my position here is that this is not— Congress intended for this statute to apply to conduct in the outer third circle. So can I go back to my question that I tried to ask earlier, which is that for the attempts part of the statute, if you have a vessel without nationality that's in the territorial waters of a foreign country, but it's headed to the high seas, there's no dispute. It's steaming towards the high seas. It's interjected before it gets to the high seas. Would you say that the attempt part of the statute doesn't apply to that, or would you say that it's okay because with a vessel without nationality, there's no limitation as to the high seas. The territorial waters are enough. Yes. Well, it depends on how this court intends to apply Beleza-Curtado. Beleza-Curtado, that court found that the drug trafficking doesn't violate the law of nations, so it would depend on how this court would address the Beleza-Curtado decision. But there would be a constitutional limitation, but in terms of the statute, the statute would apply. Yes. Only if you found that the holding of Beleza-Curtado did not actually affect the vessel without nationality provision. Going back to the Charming Betsy analysis, the reason that the Charming Betsy doctrine exists, it's spread in the idea of separation of powers. We're sort of well out of time. Unless there's more questions on the topic we've been discussing, you might want to switch to some other topic unless you want to leave the rest of your issues for the briefs. I'm sorry, you can proceed with your question. Well, I think we're out of time. Oh, I'm sorry, I thought you were saying- You're eight minutes over almost. Okay. But I'll give you a few more minutes if you want to talk about another topic in your brief, but if you want to rest the other topics on the brief, that's also fine. Okay, thank you, Your Honor. Sure. Now, I just want to briefly address the Fifth Amendment due process claims. The district court here acknowledged in sentencing that Mr. Beleza-Curtado's role was minimal. He never handled the drugs. He had no decision-making authority or knowledge of their intended destination. Under the relevant U.N. Convention, the 1988 Convention did not put Mr. Beleza-Curtado on notice of global prosecutions in contrast to the Ali decision. The intended purpose of the 1988 Convention is to specifically for each signatory country to develop its own domestic laws and for the enforcement to be by the domestic country. Here we have a Colombian investigation, Colombian wiretap, Colombian defendant, all the conduct, his relative conduct was of the country of Colombia. Now, he gave information about the location of ships, Coast Guard ships, U.S. Coast Guard ships. Right. Is that right? Yes. He resold five maritime reports, but he did not, in other words, he did not inject himself to have an effect on the United States. Even though he gave information about whether the U.S. Coast Guard could intercept the vessel. Right. And compared to other case law, usually there's a situation where someone communicated in the United States, where they intended to import drugs in the United States, or... So if he says, you know, one country you should be really wary of is the United States because their Coast Guard is very aggressive. Here's the particular spots where the United States Coast Guard's vessels are located. You don't think that that puts himself within the purview of the United States, even though he's specifically talking about the United States as Coast Guard vessels? No, I don't believe that would be sufficient because the 1988 Convention is very clear as far as its terms. Another thing I want to address is, okay, as far as the fact that he's a Colombian defendant, Colombian national, Colombian contact, it's very similar to what Chief Justice Stevens said in the Morrison decision, where he wrote that this case has Australia written all over it. This case has Colombia written all over it. The district court in Palazzo Cortado, when they granted the motion to dismiss, the Panamanian defendants, when it was affirmed by the 11th Circuit, the Panamanian defendants were sent back to Panama. They were a prosecutor in Panama, and they're now incarcerated in Panama. We're not asking that anything different should have happened here. Mr. Balesta should have been punished in Colombia and incarcerated in Colombia, not here in the United States. Thank you. Thank you very much. We'll hear from the government. Good morning, Your Honor. May it please the Court. Scott Misler on behalf of the United States. I'll start with the statutory question, if I can, and with the opponent's reliance on the Kiobo case. Kiobo, I think, is very different than this for the very reason that this Court mentioned in the hostage-taking analysis in Ali, which is that this statute has a specific congressional declaration to apply extraterritorially. Kiobo was dealing with a civil statute that was kind of a sui generis statute, the alien tort statute, in which courts were actually inferring causes of action that could be brought under a jurisdictional provision. So the Court was advocating caution on the part of courts in inferring causes of action and didn't have you for an explicit congressional declaration. Then you run into the issue. But isn't it a problem that the explicit extraterritorial application is for 05-3? I'm sorry, 705-03 instead of 06? I don't think so, Your Honor. The only difference drafting-wise between this statute and the LEA and the hostage-taking statute is basically whether the word attempt to conspire is embedded in the substance of provision or whether it's dropped down a bit. I think this statute was modeled after the general drug statutes in Title 21. For Title 841, Section 841 is the substance of prohibition. 846 is a separate. The mail fraud statute, 1341, is the prohibition. 1349 is the attempt or conspire. That's just the way Congress often and usually drafts conspiracy provisions. Another point I'd make is that 705-03, 705-03-A is the prohibition, 705-03-B is the extraterritorial declaration, 705-03-C is an affirmative defense. And I can't imagine that the government in a 705-6 conspiracy case would say that the affirmative defense doesn't carry over to conspiracy. The conspiracy provision, 705-06-B, says 705-03 as a whole. It doesn't say 705-03-A. So I take the other side to be saying that their strongest argument is not that the conspiracy provision doesn't apply extraterritorially at all. It's that based on the interpretive principle set out in Ali, which the government itself invokes, the extraterritorial reach of conspiracy is coterminous with the extraterritorial reach of the underlying substance of defense. And then what you infer from that is that the conspirators also have to be on board the vessel. Right. I think there's a couple problems with that. We can talk about the practical differences in a moment. But I think one thing it does, it's important to mention, and we perhaps didn't emphasize it in our brief, but the district court did mention this in its oral decision denying the motion to dismiss. The MDLEA's conspiracy provision doesn't have an overt act requirement. Some statutes do. 371, the general conspiracy statute in Title 18, does. But the drug statute in Title 21 don't. Neither does the MDLA, which the district court recognized here. If you add in an on board the vessel requirement, it's very similar to requiring an overt act, to wit, that the person be, take an act to go on board the vessel. And so it would really kind of reverse congressional drafting principles in terms of including or excluding an overt act requirement to make someone be on board the vessel as part of the conspiracy. How are we supposed to know what conspiracy means within 06? I think conspiracy has a well-established, and again, the overt act requirement is part of that, right, has a well-established meaning at common law and in statutory drafting that is an agreement with an unlawful purpose and the person has to knowingly and willfully join that, sharing its unlawful purpose. And they have to submit to overt acts, right? You don't, Your Honor, because I think in this instance, the Supreme Court in the Schiavone case in the 90s, which involved the drug statutes and with respect to the money laundering in Whitfield in 2005, articulated a general principle that's understood since the time of the Sherman Act in the early 20th century, that if Congress includes an overt act requirement and it knows how to do so, the courts will enforce that. But if Congress doesn't put one in there, the courts do not read one in there. And that's the way it's operated in the drug statute in the Schiavone case from 1994. I think the MDLEA works in the same way. There's no overt act requirement in the statute. And if you enforce an on-board-the-vessel requirement, it's very similar to requiring an overt act of being on-board the vessel. So our submission is that doesn't make sense as a matter of statutory drafting and structure. And then you run into the practical problem that I think the conspiracy would add very little. Your Honor is right, Judge Wilkins, that in some instances you can envision a scenario, I think fairly rarely, where someone is going to be able to, the government is going to be able to approve an agreement to traffic drugs on a vessel, subject to U.S. jurisdiction, but be unable to prove constructive possession and absolute lack of knowledge on the part of the crew members. But that's rare. And so the Supreme Court's candidate instructions say not only do you avoid reading a statute to render it meaningless, but also to render it insignificant. And so here I think reading it in that fashion would render the term insignificant. It also runs into the problem, as Judge Trinovasan suggested, about the neighboring attempt word. This court in the Delgado-Garcia case involving the inducement of aliens to enter the U.S. focused on that. And so basically attempt is usually going to be outside the U.S. trying to come in, look inward. And the same is true here. It's that the attempt provision, I think as a factual matter, is likely to apply when someone is on a foreign land setting the vessel out at sea or, as Your Honor suggested, in territorial waters that aren't yet the high seas. So that provision also, I think, would have a very limited impact, if at all, unless it's read to apply to conspiratorial conduct on foreign soil. Where is this overt act argument made in the brief? It's not made in the brief, Your Honor. I tried to fess up to that at the beginning. But as I was preparing for argument, I thought that that was an interesting point, that beyond where the vessel requirement really would amount to an overt act. I'd be happy to submit a letter, if the Court likes, with the citations I mentioned, if that would be helpful. But I think it's really part of our textual and structural argument, though, which is that this is really nullifying the full reach and the meaning of the term conspiracy. And we do the same thing with the term attempt. But the government prosecutes cases every day where they may not be able to prove possession if, let's say, they have drugs found in the trunk of a car. Or here we can just say that they're in somewhere hidden in the boat. And they might be able to prosecute the owner of the boat successfully for possession because they can infer to the jury more easily that the owner would have knowledge and both dominion and control over the drugs, but not a passenger or a crew member. Isn't that the work that conspiracy can do in this context? I think it can. Even without an overt act requirement? No, it can. That's why I said I don't want to overstate it by saying that I think reading the statute in the way the appellant reads it would render the conspiracy provision meaningless. I think it would render it much less significant. And contrary to what Congress was trying to accomplish, it would really read the statute as Much less significant in that it wouldn't reach people on foreign soil, but not much less significant that it would still reach people who were part of the conspiracy as far as on the boat, right? Right, but I think it has the effect that reading the statute is a crew member statute. It reads the statute as applying only to the folks on the lowest part of the drug trafficking hierarchy. And legislative history isn't incredibly informative here, but we have quoted the Senate report. I think it does recognize that Congress is after two parts of this. They were after not just the crew members, but the trafficking organizations. And the people on the motherships, right? I think so. But I think it's important to point out that if you look at the House report, the mothership provision ended up being addressed by the statute, by what's currently the statute that defense counsel mentioned here, which is the statutes that govern importation. And what Congress was also worried about was the difficulty, and the Senate report says this as well, Your Honor, the difficulty of proving intent to import. And so the separate part of the statute that became the MDLEA did address that, did address intent to import on motherships. But Congress also spoke more broadly. So you're saying that motherships can only be prosecuted under this intent to import, the 959 provision? They're not. But again, I think that's what you're talking about, motherships. That was an enterprise by which a boat sat just outside territorial waters and sent other vessels into U.S. territorial waters. So I think intent to import in those cases wasn't as difficult to prove. I'd also mention that I think you're creating basically another type of mothership problem here. It's, again, the scenario that Judge Srinivasan described earlier, where you have boats that are or even just take land-based conspirators. Anyone, as soon as they hit international waters, you have on a stateless vessel, you have vessel without nationality under the statute. You have unquestionable Article I authority under the High Seas Clause. But the person, as one of Mr. Baez's co-conspirators here, the person who put the engines on the boat to make it a go-fast vessel, who waved goodbye from the dock, he's out. So you're creating another barrier where it's just on one side of the line, used to be a mothership, is now the person at the dock loading the boat to go international waters. And, again, I think— I don't know if the mothership occurs in the real world, and maybe it does. But under the statute, would it have to be the case, then, if mothership was part of the impetus behind the conspiracy provision, that the mothership itself would have to be a vessel subject to the jurisdiction of the United States? I don't know the answer to that, Your Honor. I don't know the answer to that. Because otherwise, how does the vessel come within the statute? If it's somebody on—in other words, you have to be on board the vessel, and the goal is to get people who are on board a mothership. Then I take it, in order to come within the statute, the mothership itself would have to be a vessel subject to the jurisdiction of the United States. Is your question on the balanced interpretation of the statute? Yes. Yes, I agree. I think that's correct. And is that—I just don't know how this happens in the real world. In the real world, to the extent there are the motherships that kind of direct the activities of satellite operations, do those tend to be stateless vessels, too, or are those flagged vessels? I don't know, Your Honor, that there's been recent mothership prosecutions. Most of the cases I've reviewed, the mothership problem was, I think, a way of doing business many years ago when the Marijuana on the High Seas Act was passed. I don't want to say that it's not used now. I just don't know. Okay. But most of the cases we reviewed and have already cited here don't involve mothership scenarios. The closest one I can think of is the Pulaski case with the 9th Circuit, which wasn't really a mothership. It was a refueling vessel that went alongside a fishing vessel. But I'm not sure of the answer to that. Sorry, Your Honor. I did want to mention the point, which I think is important, that there are different requirements potentially under the statute in Article I. I think that folks were looking before for the international waters or high sea references in the current version of the MDLEA, and they're not there. There was a reference to high seas in the Marijuana on the High Seas Act when it was passed. But I believe starting in 1986 when the MDLEA was passed, Congress removed that reference. And so there may be scenarios, as I think counsel rightly pointed out, where the statute will reach into territorial waters and not require the high seas, and then that would raise an Article I issue. But, again, that's not an issue in this case. And I do want to emphasize that this case is not Eliza Hurtado. We tried to demonstrate both on the basis of the stipulated facts agreed to by the parties and on the basis of the judicially noticed documents we provided. But this case involved both travel on and vessel seizure in international waters. So if you don't have the travel on and seizure in international waters, does your argument change? In other words, assume away the necessary and proper clause for a second and just focus on the felonies clause. So it's to define and punish felonies committed on the high seas. So if all you have is two individuals reaching an agreement on foreign soil and nothing ever happens on the high seas, there's still a conspiracy, particularly if you don't need to overact. There's still a conspiracy. And are you saying that your interpretation of the constitutional provision is that even though everything occurred, all the actus reus occurred on foreign soil, that's still a felony committed on the high seas? So our understanding, and it's hard for me to put aside the necessary and proper clause, I think that's pretty important here, but our understanding of the high seas clause power is that it would apply to an agreement where there was no overact committed on the high seas, but the contemplated and planned use of the high seas. And how is that punishing a felony committed on? What's being committed on the high seas? That is committed on the high seas there, but there's planned use of the high seas. So our understanding of how conspiracy law works, of course, is the conspiracy law criminalizes the unlawful agreement itself. And so it would be, I think, extremely difficult to prove. You can imagine a scenario where there was a wiretap and there was a detailed explanation of what happened. In that kind of rare scenario, one could imagine a prosecution, but it would be extremely difficult to prove that. I think you'd have to have concrete planned use of the high seas. Again, this is, I think I'm talking really here about a constitutional matter, not as a statutory matter because one can imagine, again, a planned law enforcement knowledge that there was a planned use of a stateless vessel that would qualify as a vessel subject to U.S. jurisdiction, and that wouldn't necessarily comply with Article I. This seems to completely contradict the argument in your brief. The argument in your brief was that under a Pinkerton-type theory of liability for conspiracy, you could impute the acts on the high seas to someone who stayed on land. And therefore, if you construed the statute that way, then there's no Article I problem because you're just imputing acts on the high seas to which there's clearly jurisdiction to someone who stays on land. Now you're saying that even if no acts are ever committed on the high seas, the statute still applies. I mean, which interpretive engine are you using here? I think we're using both. One, I think it's a hypothetical case where there's much, I think, a harder case for us, which is nothing ever happens because we still have Article I authority. There's no actual use of the high seas. And I'm talking about a scenario where we have evidence of planned or contemplated use of the high seas, and that, I think, is a harder case for us but would still apply. This case is the Pinkerton scenario Your Honor described. We have actual use of the high seas by co-conspirators, and so that can be imputed to land-based conspirators who can knowingly and willfully join in this conspiracy. And as Judge Trenovasa mentioned earlier, you have stipulated facts here, agreeing that the defendant provided not just asset maps in general, but asset maps that informed the location of U.S. Coast Guard vessels. So this was not, and I guess maybe to transition to the due process point before my time runs out, this is not a scenario where there's absolutely no foreseeable prosecution in the U.S. I think it's foreseeable that when you give someone a map and say, here's how you avoid these law enforcement, these U.S. forces, and something goes wrong, and they're unable to avoid U.S. forces, that the place they're going to be prosecuted is by the forces that catch them. Can I just follow up on the Pinkerton point? So in the Pinkerton scenario, is it that you have convicted conduct that occurred on the high seas? Is it that you have charged conduct that occurred on the high seas? Where are you getting the ability to piggyback on something that, in fact, occurred on the high seas? Well, I think in the scenario of a motion to dismiss, Your Honor, it would have to be charged conduct. There's a pretrial motion to dismiss based on an unconstitutional application of the MDA. That would be an as-implied challenge, I take it. I think you'd be talking about charged conduct in that case. I think that for that purpose is the district where we have to accept the allegations and the indictment made by the government and rule on that basis. Just to finish up the due process point here, I think our primary submission, based on the same kind of imputation theory and foreseeability theory, is that no circuit would require a nexus where you have stateless vessels. And it's true that those cases have involved actual crew members of the vessels, but we think the same principle applies here. So no circuit would require a due process nexus where stateless vessels are used on the high seas. We think the same applies here. And even if not, under this Court's analysis in Ali, the concluding parts of Ali, they don't actually endorse specific due process tests. They discuss the arbitrary and fundamentally unfair standard. I mentioned some facts and stipulated facts here that we think are crucial to establishing that it wouldn't be unfair or arbitrary in any way to apply U.S. law here. But even if not, the end of Ali also mentions that it's not required that you absolutely know that your prosecution is going to be in the U.S. so long as you know the conduct you've committed is criminal and can be prosecuted somewhere. And the Court cited a Second Circuit case without proposition. If that's the test, and Ali didn't settle on one, then we think, again, it's easily met because the 1988 Convention and the laws of Colombia and the U.S. of course make this criminal conduct. Any further questions? Questions from the panel? Thank you very much. I know there's no time left, but we'll give you another minute anyway. A few things I want to bring to the Court's attention. As far as the legislative history, if you look at page 48 of the appendix, we have a complete quotation of the block paragraph that the government cites in their brief at page 22. And they omitted a preceding sentence that makes it clear that when Congress enacted the statute, their concern were those who were traitors apprehended on the high seas. I'd also like to point out, as far as other statutes, if you compare this statute with 18 U.S.C. Section 2339B, the Criminal Statute for Providing Aid to Terrorist Organizations, their Congress has been very clear in the extent of how extraterritorial jurisdiction should apply. They have a specific provision that says that U.S. jurisdiction could extend to conspirators who directly conspired with U.S. nationals or resident aliens. I also want to point out the government cited to the case U.S. v. Lawrence. And in that case, the conspirators were a U.S. citizen and a U.S. resident, whose conduct and furtherance of the conspiracy occurred on U.S. soil. This case is very different. And the Fifth Circuit in U.S. v. Lawrence specifically limited its holding. It says, quote, we do not today address the question of application of 959B to a crime where no actions related to the crime were committed in the United States. Questions? Do you have any more questions? Thank you. Apparently not. Thank you. The case will be taken under submission. Ms. Park, you were appointed by the court to represent the appellant, and we're very grateful for your assistance, which was excellent. Thank you.
judges: Garland, Srinivasan, Wilkins